[No. B061692. Second Dist., Div. Seven. May 10, 1993.]

ALBERT E. THOMKA, Plaintiff and Appellant, v.
FINANCIAL CORPORATION OF AMERICA et al., Defendants and
Appellants.

THOMAS R. JONES et al., Plaintiffs and Appellants, v.
FINANCIAL CORPORATION OF AMERICA et al., Defendants and
Respondents.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication. The portions to be published follow.

COUNSEL

Mathews & Evans, Charles T. Matthews and William D. Evans for Plaintiffs and Appellants.

Jeffer, Mangels, Butler & Marmaro, Louise Ann Fernandez, Jay A. James, Jonathan W. Biddle, Fenigstein & Kaufman and Harold J. Tomin for Defendants and Appellants and for Defendants and Respondents.

OPINION

STANIFORTH, J.*—This is a consolidated appeal in two separate cases joined for trial.

## CASE I

Albert E. Thomka filed a multicount civil action against defendants/appellants New West Federal Savings and Loan Association.[1] Thomka named eight individual corporate officer employees as defendants.[2]

At close of plaintiff's evidentiary case the trial court nonsuited all but one of Thomka's causes of action against New West and nonsuited all of Thomka's claims against the individual defendants. The only cause of action remaining was for breach of employment contract against New West. After defense presentation of their case and appropriate instruction, the jury returned a verdict against New West in Thomka's favor in the sum of $963,000.

New West filed posttrial motions, seeking judgment notwithstanding the verdict (JNOV) or a new trial. The trial court denied the motion for JNOV but granted the motion for new trial conditioned upon Thomka's acceptance of the reduction of the verdict to $130,667. Thomka consented to the remittitur and judgment was entered for $130,667. The corporate defendants appeal this judgment. Thomka filed his cross-appeal to reinstate the original

---

*Retired Associate Justice of the Court of Appeal, Fourth District, sitting under assignment by the Chairperson of the Judicial Council.

[1] The complaint named as defendants Financial Corporation of America, American Savings and Loan and FCA Asset Management, who jointly operated American Savings and Loan savings banks. Subsequently, the Federal Savings and Loan Insurance Corporation (FSLIC) appointed New West Federal Savings and Loan Association as receiver for the banks and New West was added as a party defendant. New West had succeeded to the assets and liabilities of the predecessor corporate defendants. We refer to the corporate parties (respondent) on appeal as New West.

[2] The named individual defendants are Robert J. Blain, Thomas P. Kennett, John Hamilton, Sheila Wilson, Mary Nubel, Kathy Towers, Carolyn Mayberry and Phyllis Cormier.

judgment of $963,000. (See *Rosenau* v. *Heimann* (1990) 218 Cal.App.3d 74, 77 [267 Cal.Rptr. 20].)

## CONTENTS

On appeal New West contends Thomka's employment was an "at will" status and that no "cause" was required before discharging him. Further it is asserted Thomka's action is preempted (barred as a matter of law) on these bases: (a) the federal banking (the Federal Home Loan Bank Board; FHLBB) regulation (12 C.F.R. 563.39) or (b) the doctrine of *D'Oench, Duhme & Co.* v. *F.D.I.C.* (1942) 315 U.S. 447 [86 L.Ed. 956, 62 S.Ct. 676], as now partially codified in 12 United States Code section 1823.

On his cross-appeal Thomka contends that if the original verdict is not restored, then at least New West is liable for the reduced judgment of $130,667.

## I

### *Facts on Thomka's Case*[3]

Thomka and the Jones plaintiffs were employed by American Savings as account executives selling jumbo certificates of deposits (CD's) to the public but principally to large investors and institutions such as banks and credit unions. Thomka was first hired by American Savings in his home town of Pittsburgh, Pennsylvania in 1983. His boss, Mr. Lester Hueber, told him if he got a CD portfolio of $5 million in six months and if he worked hard and diligently he could have a good career and make a lot of money. Hueber referred to the six-month period as a "probation period." Thomka was not required to sign any FCA Asset Management sales regulation (Sales Regulations).

When the Pittsburgh office closed in March 1985, Thomka was transferred to Southern California (Encino). In April 1986 he received the "Good Guy" award. Later, after he was in Southern California, Thomka periodically signed Sales Regulations. However, none contained "at will" language until shortly before he was fired. Thomka met the "quota" production requirements.

Thomka (and the Jones plaintiffs) during the last year and one-half of employment, and before this litigation, worked in the same office located at

---

[3]Much of this evidence came in the consolidated trials on the issues common to cases I and II. We view the evidence as we must in the light most favorable to the judgment.

Rancho Park. They were supervised by account executive Hamilton. Several witnesses testified at the consolidated trial either express or implied promises of continued employment in addition to those described by Thomka. This evidence supports Thomka's factual position. Thomka became a top performer in sales with a book exceeding $5 million at one time. There was much evidence of the custom practice and treatment of all the account executives as permanent "non-probationary" employees. The "at will" status was never discussed.

New West contends these account executives were governed by the Sales Regulations which imposed a quota system of employee production. An employee would be placed on probation if he fell below this quota. Thomka (and the Jones plaintiffs) testified compliance with these quotas was made difficult or virtually impossible for a group of the so called "have nots." These "have nots" could be terminated from their employment for noncompliance with the quota.

Thomka (and the Jones plaintiffs) testified to certain sales practices which were required of them to improve the account executive's performance. These management-imposed requirements required misrepresentation and fraud. Evidence was that following these practices resulted in misleading of customers and accusation of fraud. Thomka (and the Jones plaintiffs) objected to these tactics required of them.

Thomka (and the Jones plaintiffs) testified they were terminated for pretextual reasons. They were terminated from their jobs because they would not go along with the misleading practices. Moreover, the firing of an account executive would leave the ousted account executives' investment portfolios to be divided among the so called "haves"—a group of account executives who did not protest the improper soliciting devices required of account executives. Moreover, whenever an account executive was terminated it would increase the income of such manager.

At or about the time Thomka (and the Jones plaintiffs) were terminated in late 1987, for the first time the Sales Regulations which they did sign contained "at will" language. The Sales Regulations declared in effect New West could sever their employment at any time with or without cause.

There is a factual dispute as to when the "at will" language first appeared. Witness Jones testified the "at will" language never appeared in the Sales Regulations until October 1986. Thomka's view of this factual dispute is supported by substantial evidence. The employees were not notified when the language was added to the Sales Regulations.

New West contends the "at will" language was included earlier and that Thomka signed five such documents. No documentary evidence supports this assertion. There is no evidence that such language was other than ex parte addition to the Sales Regulations. It was not communicated to Thomka or the Jones plaintiffs.

Several witnesses describe a meeting in September 1986 when American Savings was experiencing a difficult financial period. An official came from San Francisco to conduct the meeting with the account executives. He announced American Savings was going through difficult times, and the account executives who would continue to meet their quota at the end of the quarter would be around for a long time because the company needed them. The account executives "would have a home with American Savings."

New West presented evidence to persuade the jury (without success) Thomka was fired for cause. Thomka was injured on the job when his chair fell over backwards causing him a back injury. New West asserted Thomka had psychiatric difficulties for which he *must* obtain help or be fired. It was testified he had threatened a person with a gun; that he was paranoid. The jury did not accept this evidence as proof of cause to fire. ■ Substantial evidence supports the jury verdict.

## II

We assume there was a 1986 insertion of the "at will" language in the Sales Regulations. Yet in a conceded "at will" employment relationship the employer's right to terminate the employee is not unlimited.

The seminal authority on this issue is *Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311 [171 Cal.Rptr. 917]. The appellate court held in the context of a termination of an "at will" employment, there are certain limitations on an employer's power of dismissal. *"The mere fact that a contract is terminable at will does not give the employer the absolute right to terminate it in all cases."* (Italics added.)

The plaintiff in *Pugh* had been employed by the defendant for 32 years, during which time he worked his way up the corporate ladder from dishwasher to vice-president. (116 Cal.App.3d at p. 315.) When hired, he had been assured that " 'if you are loyal . . . and do a good job, your future is secure.' " (*Id.*, at p. 317.) During his long employment, the plaintiff received numerous commendations and promotions, and no significant criticism of his work. Throughout this period the company maintained a practice of not terminating administrative personnel without good cause. On this evidence,

the Court of Appeal concluded the jury could determine the existence of an implied promise that the employer would not arbitrarily terminate the plaintiff's employment. (*Id.*, at p. 329.)

In *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 676 [254 Cal.Rptr. 211, 765 P.2d 373], the Supreme Court was urged to overrule or modify the *Pugh* v. *See's Candies, Inc., supra,* rule. The Supreme Court declared:

"[D]efendant urges that we disapprove precedent permitting a cause of action for wrongful discharge founded on an implied-in-fact contract and require instead an express contract provision requiring good cause for termination, supported by independent consideration. Alternatively, defendant requests that we distinguish *Pugh* and its progeny from the present case. We conclude, however, that *Pugh* correctly applied basic contract principles in the employment context and that these principles are applicable to plaintiff's agreement with defendant." (47 Cal.3d at p. 676.)

The *Foley* court concluded:

"In the employment context, factors apart from consideration and express terms may be used to ascertain the existence and content of an employment agreement, including 'the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged.' (*Pugh, supra,* 116 Cal.App.3d at p. 327; see Note, *Implied Contract Rights to Job Security* (1974) 26 Stan.L.Rev. 335, 350-366 [reviewing factors courts have used in implied contract analyses].) Pursuant to Labor Code section 2922,[4] if the parties reach no express or implied agreement to the contrary, the relationship is terminable at any time without cause. *But when the parties have enforceable expectations concerning either the term of employment or the grounds or manner of termination,* Labor Code section 2922 does not diminish the force of such contractual or legal obligations. The presumption that an employment relationship of indefinite duration is intended to be terminable at will is therefore 'subject, like any presumption, to contrary evidence. This may take the form of an agreement, express or implied, that . . . the employment relationship will continue indefinitely, pending the occurrence of some event such as the employer's dissatisfaction with the employee's service or the existence of some "cause" for termination.' (*Pugh, supra,* 116 Cal.App.3d at pp. 324-325, fn. omitted.)" (*Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d at p. 680, italics added.)

---

[4]Labor Code section 2922 provides in relevant part: "An employment, having no specified term, may be terminated at the will of either party on notice to the other. . . ."

New West cites *Gerlund* v. *Electronics Dispensers International* (1987) 190 Cal.App.3d 263, 270 [235 Cal.Rptr. 279] in support of its position. *Gerlund* is not in point for it involves a "integrated agreement." Other cases cited by New West in support of its argument are "integrated agreement cases" factually. There is no such factual base here.

We conclude the *Pugh* and *Foley* rules apply. They authorize admittance of the factual matters presented to the jury and the resultant verdict. Under California law, Thomka's damage award for breach of implied-in-fact contract rests upon sound factual and legal grounds.

## III

New West next asserts "even if the judgment is upheld under California law then the decision must be reversed.

The reason proffered? Thomka's cause of action for wrongful termination is preempted and barred by federal regulation, FHLBB, 12 Code of Federal Regulations section 563.39.

That section provides in relevant part:

"(a) General. A savings association may enter into an employment contract with its officers and other employees only in accordance with the requirements of this section. . . . [¶] (b) *Required Provisions.* Each employment contract shall provide that: [¶] (1) The association's board of directors may terminate the officer or employee's employment at any time, but any termination by the association's board of directors other than termination for cause, shall not prejudice the officer or employee's right to compensation or other benefits under the contract. The officer or employee shall have no right to receive compensation or other benefits for any period after termination for cause. Termination for cause shall include termination because of the officer or employee's personal dishonesty, incompetence, willful misconduct, breach of fiduciary duty involving personal profit, intentional failure to perform stated duties, willful violation of any law, rule or regulation . . . or final cease-and-desist order, or material breach of any provision of the contract."

This identical argument was made by New West in *Honig* v. *Financial Corp. of America* (1992) 6 Cal.App.4th 960, 965 [7 Cal.Rptr.2d 922]. The court (Division Five) rejected this argument saying:

"The argument that California courts lack jurisdiction in these matters was recently rejected in *Hall* v. *Great Western Bank* (1991) 231 Cal.App.3d 713

[282 Cal.Rptr. 640]. Although *Hall* was a case based upon charges of wrongful termination in violation of public policy, the case did not limit its ruling to such claims as contended by respondents. The court held that section 563.39 does not preempt state law. (*Id.* at pp. 717, 721-722; *Cole* v. *Carteret Sav. Bank* (1988) 224 N.J.Super. 446 [540 A.2d 923, 926].) Additionally, we note that appellant's claim is based upon a discharge in violation of public policy. *Thus, even if Hall was limited as contended by respondents, California courts have jurisdiction to consider appellant's claims." (Id.,* at p. 965, italics added.)

In *Hall* v. *Great Western Bank* (1991) 231 Cal.App.3d 713, 718 [282 Cal.Rptr. 640] it was held:

"*We find in the regulations before us no express congressional intent to reserve jurisdiction exclusively in the federal courts.* Therefore, we conclude that the statement of preemption found in 12 Code of Federal Regulations, section 545.2 does not affect jurisdiction, *and that state courts have concurrent jurisdiction over claims arising under the regulation.*" (Italics added.)

New West contends *Hall* does not apply because *Hall* involved a claim of discharge in violation of public policy, not as here, a breach of implied-in-fact contract. *Hall,* however, relied upon *Cole* v. *Carteret Sav. Bank* (1988) 224 N.J.Super 446 [540 A.2d 923], (a breach of implied contract case) as "persuasive authority," saying:

"We find *Cole* v. *Carteret Sav. Bank, supra,* 540 A.2d 923, to be more persuasive authority. In that case a savings and loan employee alleged that he was wrongfully terminated in violation of an implied contract doctrine based on an employee manual. The reviewing court rejected the defense contention that this claim was preempted by the very statutory and regulatory provisions with which we are concerned in the case before us. . . . '[T]he very regulation in question, 12 C.F.R. § 563.39, indicates a clear *concern for employee rights.* Thus one can see an expression of policy by Congress with regard to home loan banks of affording no protection to employees, while the bank board by regulation apparently determined to afford protection to employees of federal savings and loans fired without cause. . . . [¶] It seems unlikely that the presence of said regulation amounts to an intent by the board to preempt federal savings and loans from the thrust of state law that affords protection to the employees of such institutions. An analysis of HOLA and the board's regulations implementing it fails to reveal any intent to bar state established protection for such employees.' (*Cole* v. *Carteret Sav. Bank, supra,* 540 A.2d at pp. 925-926.)" (231 Cal.App.3d at p. 721, italics added.)

Finally the *Hall* court concludes:

"Contrary to respondent's contention, the regulation specifically and *unambiguously protects an 'employee's right to compensation or other benefits under the contract' in the event the employee is fired without cause. Thus, the regulation provides protection to employees which is similar to that provided under state law where there exists a valid agreement for job security.*" (231 Cal.App.3d at p. 718, italics added.)

We conclude the federal regulation, 12 Code of Federal Regulations section 563.39, does not preempt or bar Thomka's cause of action.

IV

 New West next relies upon the *D'Oench, Duhme & Co.* v. *F.D.I.C.*, *supra*, 315 U.S. 447 doctrine as a preemptive bar. The *D'Oench, Duhme* doctrine declares that the Federal Deposit Insurance Corporation (FDIC) as receiver may not be held liable for a claim that is inconsistent with the written documents of a failed banking institution or that is based upon unrecorded oral or written side agreements. The doctrine operates to bar both defenses and affirmative claims for relief and encompasses any claim against an insolvent institution that would either diminish the value of the institution's assets or increase its liabilities. The doctrine as it pertains to the FDIC was codified in part by enactment of 12 United States Code section 1823(e) in 1950. Section 1823(e) provides:

"No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—

"(1) is in writing,

"(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

"(3) *was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board of committee, and*

"(4) has been, continuously, from the time of its execution, an official word of the depository institution." (Italics added.)

When American Savings & Loan became insolvent its assets were assigned to FSLIC as receiver and FSLIC eventually assigned the rights and liabilities of American Savings & Loan to New West. New West claims it received the bank's assets free and clear of such claims as Thomka's relying upon the *D'Oench, Duhme* doctrine.

In *Walsh* v. *New West Fed. Sav. & Loan Assn.* (1991) 234 Cal.App.3d 1539, 1544, the court said:

"As the U.S. Supreme Court recently explained a primary purpose of the doctrine 'is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets.' (*Langley* v. *FDIC* (1987) 484 U.S. 86, 91 [98 L.Ed.2d 340, 347, 108 S.Ct. 396].) Such evaluations must frequently 'be made "with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services." (*Gunter* v. *Hutcheson*, 674 F.2d at 865.' (*Ibid.*) The doctrine also seeks to 'ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure.' (*Id.* at p. 92 [98 L.Ed.2d at p. 347].) Thus, ' "[t]he doctrine encourages debtors to memorialize all agreements in writing and reflects the equitable principle that losses incurred as a result of unrecorded arrangements should not fall on deposit insurers, depositors, or creditors but rather upon the person who could have best avoided the loss." ' (*Webb* v. *Superior Court, supra*, 225 Cal.App.3d at p. 995, quoting *Fair* v. *NCNB Texas Nat. Bank* (N.D. Tex. 1990) 733 F.Supp. 1099, 1103.)"

The doctrine applies not only to defensive use of alleged oral promises (such as in the original *D'Oench, Duhme* case), but *also to offensive use, such as fraud or breach of contract claims based upon alleged oral agreements.* (*Beighley* v. *Federal Deposit Ins. Corp.* (1989) 868 F.2d 776, 783-785; *Webb* v. *Superior Court* (1990) 225 Cal.App.3d 990 [275 Cal.Rptr. 581].) Courts hold the *D'Oench, Duhme* defense applies, moreover, even where the party asserting an oral agreement was innocent of any wrongdoing. The relevant question is not whether the oral agreement was itself fraudulent or whether the borrower intended to deceive banking authorities, but rather whether the borrower " 'lent himself to a scheme or arrangement' whereby the authorities were likely to be misled." (*Bell & Murphy & Assoc.* v. *Interfirst Bank Gateway* (5th Cir. 1990) 894 F.2d 750, 753-754.)

In *Bartrum* v. *Federal Deposit Ins. Corp.* (1991) 235 Cal.App.3d 1749, 1752 [1 Cal.Rptr.2d 614] the court held:

"[F]ederal policy, evidenced by the Federal Reserve Act, existed to 'protect [the FDIC] from misrepresentations made [by the bank] to induce or

influence [third parties], including misstatements as to the . . . integrity of securities. . . .' (315 U.S. at p. 459 [86 L.Ed.2d at p. 963].) Allowing a secret agreement as a defense would enable the notemaker to defeat the statute's purpose. The purpose of the federal policy articulated by the Supreme Court in *D'Oench* 'is to allow federal and state bank examiners to rely on a . . . bank's assets.' (*Langley* v. *FDIC* (1987) 484 U.S. 86, 91. . . .) ' "The doctrine encourages debtors to memorialize all agreements in writing and reflects the equitable principle that losses incurred as a result of unrecorded arrangements should not fall on deposit insurers, depositors, or creditors but rather upon the person who could have best avoided the loss. [Citations.]" ' (See also *Weber* v. *New West Savings & Loan* (1990) 10 Cal.App.4th 97, 102; *Webb* v. *Superior Court* (1990) 225 Cal.App.3d 990, 995.)"

## V

Without doubt the *D'Oench, Duhme* doctrine is broad in its scope and factually wherever applicable is binding upon this court. If applicable it would bar Thomka's recovery. ▆▆▆ Here, however, the doctrine has no factual application. Thomka makes no claim or defense inconsistent with any written instrument of the failed savings and loan. There is no agreement here which tends to diminish or defeat the interest of New West in any of the assets received from the failed bank.

Thomka does not impede or hinder any bank examiner—working with great speed—to evaluate the worth of a failing bank's assets. Thomka does not rely upon unrecorded documents or arrangements. In short, Thomka's claim does not fit factually any of these claims or defenses barred by the *D'Oench, Duhme* doctrine.

Thomka's action is for damages for breach of implied in fact employment agreement—that he would not be fired without just cause. Such a claim does not fall within the penumbra of the *D'Oench, Duhme* doctrine.

In *Campbell Leasing Inc.* v. *FDIC* (1990) 901 F.2d 1244, 1248-1249, the court said:

"The *D'Oench, Duhme* doctrine is 'a common law rule of estoppel precluding a borrower from asserting against the FDIC defenses based upon secret or unrecorded "side agreement" that alter [ ] the terms of facially unqualified obligations.' *Bell & Murphy & Assoc.* v. *Interfirst Bank Gateway, N.A.*, 894 F.2d at 750, 753.) [¶] . . . [¶] We conclude that the FDIC enjoys holder in due course status as a matter of federal common law whether it is

acting in its corporate or its receivership capacity. (*See Wood*, 758 F.2d at 160.)"

The federal court then held:

"*However, the district court erred in granting summary judgment against the appellants on all their claims. The appellants have a statutory right to continue their action against the FDIC as receiver for the First Republic Bank on their claims of tortious interference with contract, breach of the Campbell Leasing security agreement, and intentional infliction of mental and emotional distress.* 12 U.S.C. § 1821(d)(6)(A). *While the holder in due course doctrine prevents the appellants from asserting these claims as a set-off to liability on the note, it does not prevent the appellants from trying these claims to the district court, liquidating the amount of damages, and subsequently receiving a pro rata share of First Republic Bank's remaining assets along with the bank's other creditors.* See *id.* § 1821(d)(11)(A)(ii). We therefore must vacate that part of the district court's judgment . . . ." (901 F.2d at p. 1249, italics added.)

In *Resolution Trust Corp.* v. *Murray* (1991) 935 F.2d 89, 95, the court said:

"An unliquidated claim for damages cannot be pleaded in compensation against a liquidated claim based on a promissory note. . . . Therefore, we affirm the district court's dismissal of the Murrays' set-off claims. [¶] As this court recently held in *Campbell Leasing, Inc.* v. *FDIC*, 901 F.2d 1244 (5th Cir. 1990), *our refusal to allow disputed setoff against a liquidated promissory note held by the federal receiver does not preclude the debtors' independent action for (liquidated of and) damages from such claims as would not be foreclosed by the principle of D'Oench, Duhme, either by way of defense or reconvention.* See id. at 1249. This means that the Murrays had the right to assert *any such claims against RTC as Receiver of Delta Inc., but may not bring the claims to escape liability on the promissory notes.*" (Italics added.)

And in *F.D.I.C.* v. *Brodie* (Fla.Dist.Ct.App. 1992) 602 So.2d 1358, 1361, the court said:

"Brodie did nothing that could be construed as participation in a misleading scheme or arrangement. *He provided services the Bank required. FDIC should have foreseen that a bank would receive a variety of necessary services for which it would owe compensation.* (See *Resolution Trust Corp.* v. *Murray*, 935 F.2d 89, 95 (5th Cir. 1991) (debtor not barred from bringing independent action for damages); *Campbell Leasing, Inc.* v. *Federal Deposit Ins.*

*Corp.*, 901 F.2d 1244 (5th Cir. 1990) (Debtor's inability to offset liability to federal receiver does not bar independent action for damages).

"Furthermore, 12 U.S.C. § 1823(e), which partially codified the *D'Oench* doctrine, does not bar Brodie's counterclaims. 'By its plain language, § 1823(e) applies only to an interest in "any asset", with the agreement in writing executed contemporaneously with the financial institution obtaining "the asset",' [Citation.] . . . . *Thus, we are unable to hold that federal law insulates FDIC from Brodie's counterclaims.*" (Italics added.)

Continuing the court held:

"The rule does not determine the matter before us *because Brodie's counterclaims were not asserted against FDIC in an attempt to avoid, or defend against the note. Instead, Brodie admitted liability under the note. The counterclaims were independent actions to recover monies due for services rendered at the Bank's request. We are unable to find, and counsel have not provided, any cases where the doctrine has been applied to bar recovery of fees for rendered services.*" (*F.D.I.C.* v. *Brodie, supra*, 602 So.2d at p. 1360, italics added.)

We conclude, as in the *Brodie* case, New West has totally failed to provide any statute or case which would authorize a bar of Thomka's claim for breach of an employment contract. The judgment of the trial court in issuing its remittitur is supported by substantial evidence; therefore, it must be affirmed.

## CASE II*

. . . . . . . . . . . . . . . . . . . . . . . . .

Lillie, P. J., and Woods (Fred), J., concurred.

Petitions for a rehearing were denied June 9, 1993, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied August 26, 1993.

---

*See footnote, *ante*, page 877.